**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

L.G., through her parent and Next Friend,
M.G.,

                                    Plaintiff,

v.                                                          Case No. 2:19-cv-04191-NKL

Columbia Public Schools, et. al.,

                                    Defendants.

## ORDER

Before the Court are motions by Defendants City of Columbia and Keisha Edwards (Doc. 23) and Columbia Public Schools ("CPS") and Tim Baker (Doc. 27) pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the amended complaint (Doc. 20) by plaintiff L.G., through her next friend, M.G. For the reasons discussed below, Defendants' motions are granted in part and denied in part.

## I.   Alleged Facts[1]

Plaintiff L.G. is a sixteen-year-old, straight-A student at Rock Bridge High School ("RBHS"), which is operated by CPS. Doc. 20 ¶ 9. L.G. has general anxiety disorder ("GAD"), obsessive compulsive disorder ("OCD"), and clinical depression resulting from the GAD and OCD, for which she is treated by counselors both in and out of the school. *Id.* ¶ 10.

---

[1] In deciding the motion to dismiss, the Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiffs. *See Stodghill v. Wellston Sch. Dist.*, 512 F.3d 472, 476 (8th Cir. 2008).

On the afternoon of May 22, 2019, two officers from the City of Columbia's police department ("CPD") came to RBHS to question L.G. about an alleged sexual assault that allegedly occurred at the house of a CPS student who has the same first name as L.G. *Id.* ¶ 11. L.G. was summoned to the office during her geometry final exam, but her teacher asked for her to be allowed to finish the test before coming to the office. *Id.* ¶ 12. Immediately after her geometry final, L.G. was scheduled to finish a final project in her accounting class and then take her final exam in human anatomy. *Id.* ¶ 13. In the break between geometry and accounting, L.G. went to the office, as requested. *Id.* ¶ 14.

When L.G. reached the office, CPD School Resource Officer Keisha Edwards told L.G. that two CPD officers were there to question her. *Id.* ¶ 15. As Edwards took L.G. to a room for the interrogation, RBHS Assistant Principal Tom Baker asked Edwards if he was needed, but Edwards said no. *Id.* ¶ 17. Once L.G. was inside the room with the CPD Officers (named in the complaint as John Doe I and John Doe II), Edwards left L.G. there and closed the door behind her. *Id.* ¶ 16, 18.

The CPD officers did not have a warrant or other court order to question L.G. *Id.* ¶ 20. There were no exigent circumstances requiring L.G. to be questioned in the midst of school. *Id.* Nonetheless, neither Baker nor any other administrator requested an explanation from Edwards or the two CPD Officers regarding the need to question L.G. during her final exams. *Id.* § 22.

The CPD officers asked L.G. if she knew a student with a particular name (referred to as "Mary Doe"). *Id.* ¶ 28. L.G. told the officers that she was generally aware of a student named "Mary Doe," but that she did not know her personally and did not know if she was the same person the police were asking about. *Id.* ¶ 29. The CPD officers appeared incredulous of L.G.'s statement and pressed her for information. *Id.* ¶ 30. L.G. asked the officers if there had been a mix-up

because she knew nothing about any alleged assault. *Id.* ¶ 31. L.G. did not believe she was free to leave the room while she was being questioned. *Id.* ¶ 25. L.G. became increasingly distraught during the interrogation and started to shake. *Id.* ¶ 32. The interrogation lasted for ten to twenty minutes before officers John Doe I and II told L.G. she could leave. *Id.* ¶ 33.

As soon as she left the interrogation room, L.G. called her mother, M.G., in near panic. *Id.* ¶ 34. This was the first time M.G. learned that her daughter had been questioned by the police, and she immediately drove to RBHS to see her. *Id.* ¶ 35. Edwards explained to M.G. and L.G. that the police had questioned L.G. because they thought she had information about a sexual assault that had taken place over the prior weekend at the house of a student with the same first name as L.G. *Id.* ¶ 36. After speaking with Edwards, M.G. insisted on seeing L.G.'s counselor, Gretchen Cleppe, who was familiar with L.G.'s struggle with OCD, GAD, and depression. *Id.* ¶ 37. Counselor Cleppe was very surprised to learn what had happened and immediately called Assistant Principal Baker, who then met with L.G. and M.G. *Id.* ¶ 38. Baker told M.G. and L.G. that he had seen Edwards taking L.G. to be questioned by police and had asked Edwards if she needed anything, but Edwards had said no. *Id.* ¶ 39.

By the end of the conversations between L.G., M.G., Edwards, Cleppe, and Baker, L.G. had missed her accounting class and felt too traumatized to take her anatomy final. *Id.* ¶ 40. L.G. had to finish her accounting project over the weekend and come back to take the anatomy final the following Tuesday (after Memorial Day) when all other students had already been released for the summer. *Id.* ¶ 41. L.G. performed poorly on both her accounting project and her anatomy final due to the extreme anxiety caused by her interrogation by CPD officers. *Id.* ¶ 42. Since her interrogation, her mental health has deteriorated further. *Id.* ¶ 43. L.G. receives ongoing treatment in the form of medication and therapy. *Id.* ¶¶ 43, 77.

CPS has a written policy, adopted by the elected school board, that states, "When law enforcement officials find it necessary to question students during the school day or during periods of extracurricular activities, the school principal or designee will be present . . . ." *Id.* ¶ 19. The policy also states that the "[t]he principal ordinarily will make reasonable efforts to notify the student's parents/guardians." *Id.* Nonetheless, L.G. alleges, CPS has a regular practice of permitting law enforcement officers to seize students at school without a warrant, probable cause, reasonable suspicion, or exigent circumstances and to interrogate such students outside the presence of a parent or adult guardian, without notifying the students' parents. *Id.* ¶¶ 61, 63.

L.G. alleges that CPD has a custom or practice of seizing minors while they are at school without a warrant, probable cause, reasonable suspicion, or exigent circumstances and interrogating them outside the presence of a parent or adult guardian. Doc. 20 ¶ 56.

L.G. asserts constitutional claims under 42 U.S.C. § 1983 against CPS, the City of Columbia, Edwards and John Does I and II in both their official and individual capacities. She also asserts common law claims against Baker and Edwards in their individual capacities. In addition to compensatory and punitive damages against all defendants, L.G. seeks permanent injunctive relief against CPS and Baker, requiring (1) that a CPS official accompany any minor student while he or she is questioned by police on school grounds, and (2) that CPS immediately notify the parents of any minor student questioned by police. She also seeks permanent injunctive relief against the City, Edwards, and John Does I and II, prohibiting CPD officers from engaging in the custodial interrogation of a minor student (a) without a warrant, probable cause, reasonable suspicion, or exigent circumstances; or (b) outside the presence of a parent or guardian. Doc. 20, ¶¶ 12-13.

## II.     Standard

Federal Rule of Civil Procedure 12(b)(6) requires the dismissal of a complaint that fails to plead facts sufficient to state a plausible claim upon which relief may be granted.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In determining whether a complaint alleges sufficient facts to state a plausible claim to relief, the Court accepts all factual allegations as true.  *See Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 995 (8th Cir. 2007).  If the facts alleged in the complaint are sufficient for the court to draw a reasonable inference that the defendant is liable for the alleged misconduct, the claim has facial plausibility and will not be dismissed.  *Iqbal*, 556 U.S. at 678.

## III.     Discussion

### A.  Claim for Unconstitutional Seizure Against Edwards in Her Official Capacity

Edwards moves for dismissal of the official-capacity claim against her on the ground that it is redundant of the claim against the City of Columbia.  Because "a suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity," where the employing entity also is named, the suit against the government official in his official capacity is redundant.  *King v. City of Crestwood, Missouri*, 899 F.3d 643, 650 (8th Cir. 2018) (quotation marks and citation omitted).  L.G. argues that she does not name the City of Columbia in Count I, and therefore the official-capacity claim against Edwards is not redundant.  However, Count II alleges a constitutional violation against the City of Columbia based, in part, on Edwards' conduct.  *See* Doc. 20 ¶¶ 57-58 ("In conformity with CPD custom and practice, SRO Edwards and John Doe I and II seized L.G. without a warrant, probable cause or exigent circumstances . . . .  The CPD's unconstitutional custom or practice of seizing minor CPS students without a warrant, probable cause or exigent circumstances . . . directly and proximately

5

caused L.G. injury in the form of extreme emotional distress requiring medical treatment and ongoing therapy.").  Thus, the official-capacity claim against Edwards and the claim against the City of Columbia are duplicative, and the claim against Edwards in her official capacity is dismissed.

### B.  Claim for Unconstitutional Seizure Against Edwards in Her Individual Capacity

Edwards argues that the constitutional claim against her in her individual capacity should be dismissed pursuant to the doctrine of qualified immunity.

"In § 1983 actions, qualified immunity shields government officials from liability [in their individual capacities] unless their conduct violated a clearly established constitutional or statutory right of which a reasonable official would have known."  *Bishop v. Glazier*, 723 F.3d 957, 961 (8th Cir. 2013) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982))).

The Court must consider two factors in analyzing qualified immunity:  (1) whether the facts alleged show that the public official's conduct violated a constitutional right; and (2) whether the constitutional right was clearly established at the time of the alleged misconduct.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  "Qualified immunity is appropriate only if no reasonable factfinder could answer yes to both of these questions."  *Hess v. Ables*, 714 F.3d 1048, 1051 (8th Cir. 2013) (quotation marks and citation omitted); *see also Pearson*, 555 U.S. at 232 ("Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.").  "The 'clearly established' standard . . . requires that the legal principle . . . be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Dist. of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 590 (2018) (citations omitted).

### i. Violation of Constitutional Right

L.G. alleges that Edwards violated her constitutional right against unwarranted seizure. "To establish a Fourth Amendment violation for her § 1983 claim, [L.G.] must demonstrate both that [the government actor] seized her within the meaning of the Fourth Amendment and that the seizure was unreasonable." *Andrews v. Fuoss*, 417 F.3d 813, 816 (8th Cir. 2005). A seizure of the person within the meaning of the Fourth Amendment occurs "only when government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'" *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 395 n. 10, 109 S. Ct. 1865, 104 L. Ed.2d 443 (1989)). To put it differently, a seizure of the person under the Fourth Amendment occurs when, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (citations omitted).

L.G. alleges that, after summoning her to the office, Edwards told L.G. she was being questioned by the police. Edwards directed L.G. into a room with two CPD Officers and closed the door, leaving L.G. alone with the officers. Just sixteen years old and a straight-A student, L.G. says she did not believe she was free to leave the room into which Edwards led or directed her. *See Jones v. Hunt*, 410 F.3d 1221, 1226 (10th Cir. 2005) ("We must view [the student's] encounter with [government officials] through the eyes of a reasonable sixteen-year-old."). The CPD's interrogation continued for ten to twenty minutes before the CPD officers told L.G. she could leave. L.G. missed her accounting class during the interrogation.

L.G. has alleged that she did not feel free to leave, and it is reasonable to infer that a minor student who was directed not to attend class so that she could be questioned by police officers, and who was then left alone with those two officers, would not have felt free to ignore Edward's

directions. *See id.* at 1227 ("A reasonable high school student would not have felt free to flaunt a school official's command, leave an office to which she had been sent, and wander the halls of her high school without permission."). Thus, she has alleged a seizure within the meaning of the Fourth Amendment. *See Thomas v. Barze*, 57 F. Supp. 3d 1040, 1067, 1069 (D. Minn. 2014) (holding that students subject to a seizure initiated by law enforcement "are entitled to the full protection of the Fourth Amendment" and concluding that reasonable jury could find seizure where student "testified that he did not feel free to leave") (citing cases); *T.S. v. State*, 863 N.E.2d 362, 372 (Ind. Ct. App. 2007) ("Significant authority exists for the proposition that a security or school officer who compels or restrains a student's movement seizes the student for Fourth Amendment purposes.") (citing cases); *A.W.M. v. State,* 627 So.2d 1148, 1150-51 (Ala. Ct. App. 1993) (finding that seizure occurred where "the police went to the high school the appellant was attending, told someone in authority that they needed to talk to the appellant, and questioned the appellant in the principal's office at the school"); *Rabinovitz v. City of Los Angeles*, 287 F. Supp. 3d 933, 956 (C.D. Cal. 2018) (finding that student directed to enter private room inside principal's office to talk with one uniformed officer, despite her earlier statement that she did not wish to speak with police, had been seized within the meaning of the Fourth Amendment); *N.U. by Amar v. E. Islip Union Free Sch. Dist.*, No. 16CV4540SJFARL, 2017 WL 10456860, at *10 (E.D.N.Y. Sept. 15, 2017) (stating that "an in-school interview is considered a 'seizure'" under the Fourth Amendment if the student "would not have thought she was free to leave or decline the adults' questioning"); *Dees v. Cty. of San Diego*, No. 14-CV-189-BEN (DHB), 2016 WL 9488706, at *9 (S.D. Cal. May 13, 2016) ("[O]ther courts agree that interviewing minors at school without parental consent can violate constitutional rights.") (citing cases); *Phillips v. Cty. of Orange*, 894 F. Supp. 2d 345, 362 (S.D.N.Y. 2012) ("Several other circuits have held that an in-school interview of a child for the

8

purpose of investigating the student's conduct constitutes a seizure under the Fourth Amendment.") (citing cases).

The next question is whether the alleged seizure was "reasonable" as a matter of law. It has long been established that "police must, whenever practicable, obtain advance judicial approval of . . . seizures through the warrant procedure . . . ." *Terry v. Ohio*, 392 U.S. 1, 20 (1968) (citations omitted). Here, L.G. has alleged that the officers did not have a warrant for the seizure.

Generally, "failure to comply with the warrant requirement can only be excused by exigent circumstances." *Id.* "A warrantless arrest is reasonable if the officer has probable cause to believe that the suspect committed a crime in the officer's presence." *D.C. v. Wesby*, __ U.S. __, 138 S. Ct. 577, 586 (2018). Another circumstance in which warrantless seizure is reasonable is "'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot'"—in such a case, "the officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." *Minnesota v. Dickerson*, 508 U.S. 366, 372–73, 113 S. Ct. 2130, 2135 (1993) (quoting *Terry*, 392 U.S. at 30).

Here, the complaint alleges that Edwards detained L.G. without probable cause, reasonable suspicion, or exigent circumstances. The alleged sexual assault as to which CPD questioned L.G. occurred at a CPS student's house—not on school grounds and, it is reasonable to infer, not during that school day. The allegations thus are sufficient to state a claim for violation of L.G.'s rights under the Fourth Amendment. *See Phillips*, 894 F. Supp. at 367 (denying motion to dismiss where plaintiffs "pled sufficient facts to plausibly raise an issue as to whether probable cause existed" for seizure of student).

Edwards argues that, because there is no allegation that she interrogated L.G. herself, she cannot be held liable for a constitutional violation. This argument erroneously conflates the seizure with the interrogation. L.G. has alleged that Edwards was the one who directed her out of her class room and told L.G. that two CPD officers had come to the school to question her, and who led L.G. into the room with the two other officers and left her there, after closing the door. In short, the complaint alleges that Edwards seized L.G. The fact that Edwards did not herself question L.G. does not mean that she cannot be sued for unconstitutional seizure.

Edwards also argues that it was only appropriate for her to close the door to allow questioning by the police officers because of the sensitive nature of the topic they wished to discuss—sexual assault. However, the issue is not Edwards' purpose in closing the door, but whether a sixteen-year old girl would plausibly believe she could not leave under the circumstances. It is a reasonable inference that a sixteen-year old directed by a police officer into a room with two other officers would not have felt free to leave regardless of whether the door was closed.

On the facts alleged, L.G. has stated a claim against Edwards for violation of a constitutional right.

### ii. Whether the Right Was Clearly Established

The next question is whether the particular right was "clearly established" at the time of the incident. "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quotation marks and citation omitted). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, but in the light of pre-existing law the unlawfulness must be apparent." *White v. Pauly*, 137 S. Ct. 548, 552

(2017). However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . ." *Hope*, 536 U.S. at 739 (quotation marks and citation omitted).

There can be no reasonable dispute that "[t]he Fourth Amendment right of citizens not to be arrested without probable cause is . . . clearly established." *Stoner v. Watlingten*, 735 F.3d 799, 804 (8th Cir. 2013). The fact that the right applies to public school students in searches initiated by police officers was well established at the time of this incident. *See Thomas*, 57 F. Supp. 3d at 1066 (finding in 2014 on the basis of Eighth Circuit precedent that officers who held "a private meeting in an inner office" of a public-school were "not entitled to qualified immunity"); *L.S. by Hernandez v. Peterson*, No. 18-CV-61577, 2018 WL 6573124, at *7 (S.D. Fla. Dec. 13, 2018) (denying motion to dismiss claim arising under Fourth Amendment where student was detained and accused of dealing drugs because the court could not say that the official's actions were reasonable under the circumstances), *appeal dismissed sub nom. L.S. v. Peterson*, No. 18-15318-DD, 2019 WL 1472973 (11th Cir. Mar. 13, 2019); *cf. Cason v. Cook*, 810 F.2d 188, 191–93 (8th Cir. 1987) (finding no constitutional violation under the lower reasonableness standard, rather than the higher probable-cause standard, where there was "no evidence to support the proposition that the activities [at the school] were at the behest of a law enforcement agency").

Thus, Edwards has failed to establish that she is entitled qualified immunity "on the face of the complaint." *Stanley v. Finnegan*, 899 F.3d 623, 627 (8th Cir. 2018).

## C. Unconstitutional Custom or Practice

The government defendants, the City of Columbia and Columbia Public Schools, both argue that L.G. fails to state a viable constitutional claim against them.

11

A municipality may be held liable for a constitutional violation under Section 1983 "if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom'; or (3) a deliberately indifferent failure to train or supervise." *Corwin v. City of Independence, MO.*, 829 F.3d 695, 699 (8th Cir. 2016) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)). Here, L.G. alleges that an unofficial custom was a "moving force behind" the constitutional violation. To succeed on such a claim, she must demonstrate: "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation." *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014).

At the outset of litigation, however, "a plaintiff may not be privy to the facts necessary to accurately describe or identify any policies or customs which may have caused the deprivation of a constitutional right." *Doe ex rel. Doe v. School Dist. of City of Norfolk,* 340 F.3d 605, 614 (8th Cir. 2003). Therefore, a complaint containing "allegations, reference, or language by which one could begin to draw an inference that the conduct complained of resulted from an unconstitutional policy or custom" is sufficient to withstand a motion to dismiss *Crumpley–Patterson v. Trinity Lutheran Hosp.,* 388 F.3d 588, 591 (8th Cir. 2004).

L.G. has alleged that CPD has a custom or practice of seizing minors at school without a warrant, probable cause, or exigent circumstances and interrogating them outside the presence of a parent or adult guardian, in violation of the Fourth and Fourteenth Amendments. Doc. 20 ¶ 56. L.G. has alleged that CPS has a custom or practice of permitting law enforcement officers to seize

students at school without a warrant, probable cause, or exigent circumstances, and to interrogate minor students outside the presence of a parent or adult guardian and without notifying students' parents. *Id.* ¶¶ 61-63. L.G. further alleges that: (i) Baker saw Edwards leading L.G. into a room to be questioned by CPD police officers, *id.* ¶ 17; (ii) Edwards left L.G. alone in the room with the two officers and closed the door, *id.* ¶ 18; (iii) despite CPS Board policy, neither Baker nor any other designee of the principal accompanied L.G. into the interrogation room, *id.* at ¶ 23; and (iv) neither Baker nor any other designee of the principal made any effort to inform L.G.'s parents of the interrogation, *id.* at ¶ 24. The allegedly casual approach of Baker and Edwards towards the interrogation of L.G.—without their knowing the reason for the interrogation, without an assistant principal or principal's designee being present during the interrogation, and without informing the minor student's parents—raises the inference that CPD officers' questioning minor CPS students in such a fashion is a common occurrence. L.G. thus has pleaded sufficient facts to raise an inference that the official policymakers for the City of Columbia and CPS knew of the unconstitutional custom and deliberately ignored or even condoned it. In short, the amended complaint plausibly alleges an unconstitutional custom or practice.

### D. Negligent Infliction of Emotional Distress

Edwards and Baker argue that L.G.'s claims for negligent infliction of emotional distress (Count IV) must be dismissed on the basis of various state law defenses and the Paul D. Coverdell Teacher Protection Act (the "Teacher Protection Act").

### i. Baker's Defense of Sovereign Immunity

Baker argues that Count IV is asserted against him in his official capacity, and that it is subject to dismissal on the ground of sovereign immunity. However, L.G. expressly states that

Count IV is asserted against Baker (and Edwards) in their *individual* capacities. Doc. 20, p. 4. Baker's argument on this point thus is moot.

### ii. Official Immunity

The official immunity doctrine shields negligent acts that a public official performs in the course of his official duties so long as the duties are discretionary, rather than ministerial, in nature. *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. 2008), *as modified on denial of reh'g* (Sept. 30, 2008). The distinction between ministerial and discretionary acts "depends on the 'degree of reason and judgment required' to perform the act." *Davis v. Lambert-St. Louis Int'l Airport*, 193 S.W.3d 760, 763 (Mo. 2006) (citation omitted); Doc. 142, p. 5.

Whether an act is discretionary or ministerial turns on "(1) the nature of the public employee's duties; (2) the extent to which the act involves policymaking or exercise of professional judgment; and (3) the consequences of not applying official immunity." *Southers*, 263 S.W.3d at 610. "[A] ministerial act is defined as an act that law directs the official to perform upon a given set of facts, independent of what the officer may think of the propriety or impropriety of doing the act in a particular case." *Rhea v. Sapp*, 463 S.W.3d 370, 376 (Mo. Ct. App. 2015), as modified (Apr. 28, 2015). "[T]he central question is whether there is any room whatsoever for variation in when and how a particular task can be done. If so, that task – by definition – is not ministerial." *State ex rel. Alsup v. Kanatzar*, 588 S.W.3d 187, 194 (Mo. 2019).

"[T]he party asserting the affirmative defense of official immunity . . . [bears] the burden of pleading and proving that they are entitled to that defense." *Nguyen v. Grain Valley R-5 Sch. Dist.*, 353 S.W.3d 725, 730 (Mo. Ct. App. 2011).

"A public employee is only liable for a ministerial act if the conduct violates either a duty imposed by statute or regulation or a departmentally mandated duty." *J.M. v. Lee's Summit Sch.*

*Dist.*, 545 S.W.3d 363, 371–72 (Mo. Ct. App. 2018). "A departmentally-mandated duty may arise from sources other than statutes or regulations such as department rules, the orders of a superior, or the nature of the employee's position." *Id.*

The alleged duty at issue here arises from a Board policy stating that "when law enforcement officials find it necessary to question students during the school day or during periods of extracurricular activities, the school principal or designee will be present and the interview will be conducted in private."

Baker cites *Boever v. Special School District of Saint Louis County*, 296 S.W.3d 487 (Mo. App. 2009), for the proposition that the applicable "ministerial duty" must be imposed by statute or regulation alone. However, subsequent Missouri appellate case law expressly holds that departmental policies are sufficient to create the ministerial duty. *See Nguyen*, 353 S.W.3d at 731 ("Such a duty can arise from departmental rules, the orders of a superior, or the nature of the position for which the defendant was employed. . . . To the extent *Boever*, *Brummitt*, and *Norton* require the pleading of a ministerial duty imposed by statute or regulation to state a claim against a public employee that is not barred by official immunity, we perceive those cases to have inaccurately stated the standard adopted by our Supreme Court.").

Baker also argues that because the Board policy states that "when law enforcement officials find it necessary to question students during the school day or during periods of extracurricular activities, the school principal or designee will be present and the interview will be conducted in private," the policy did not expressly require Baker to ensure that a principal or designee be present during L.G.'s interrogation. However, the complaint permits the reasonable inference that Baker was a "designee" who, as perhaps the only school administrator aware of the impending

interrogation, should have been present during the interrogation or at least ensured that another designee was.[2]

Edwards argues that her situation is akin to that of the fireman discussed in *Rhea*, who was driving in an emergency situation, and that therefore any duty she had was discretionary, not ministerial. Missouri courts have repeatedly held that an officer responding to an emergency "'exercises judgment and discretion and is entitled to official immunity.'" *Rhea*, 463 S.W.3d at 376 (quoting *Davis*, 193 S.W.3d at 763). However, here, L.G. has expressly alleged that the interrogation was not prompted by any emergency or exigent circumstances.

Edwards also argues that, because the Eighth Circuit has held that an "investigation of a crime is a discretionary act, not a ministerial one" (*Reasonover v. St. Louis Cty., Mo.*, 447 F.3d 569, 585 (8th Cir. 2006)), Edwards' alleged conduct in this case is protected by official immunity. But while the manner in which an officer chooses to conduct an investigation is discretionary, the discrete decision as to whether police officers should be permitted to question a student outside the presence of a school administrator and without informing the student's parents, in the face of an express policy prohibiting it, is not.

In *J.M.*, a school gym teacher advised a volunteer, DeMarco, that anyone playing the catcher position was required to wear protective gear provided by the school district. *J.M.*, 545 S.W.3d at 367. J.M. was to play catcher, but neither he nor DeMarco was able to adjust a facemask to fit him. *Id.* at 368. DeMarco therefore instructed J.M. to act as catcher without the facemask while standing further back. *Id.* A batter, upon hitting the ball, threw his bat behind him, striking

---

[2] Insofar as Baker suggests that Edwards was an "administrator" who might have accompanied L.G. in compliance with Board policy, or that he relied on Edwards to ensure that a different administrator would be present at the interrogation, the contention raises a question of fact that the Court cannot resolve upon a motion to dismiss.

J.M. in the face and breaking his nose. *Id.* While acknowledging that "DeMarco's duty was to conduct and supervise the students playing a game of softball, which required him to exercise some discretion," the Missouri Court of Appeals found that, because of the policy requiring students to wear protective gear where available, and the direct instruction from the coach regarding the gear, "DeMarco was without discretion regarding the use of the protective mask for any student playing catcher during the game." *Id.* at 372-73. Therefore, the court found, DeMarco was not entitled to official immunity.

Similarly, here, CPS Board Policy requires a specific action in a specific situation: when law enforcement questions a student during the school day, "the school principal or designee" must be present. Doc. 20 ¶ 19. The fact that Edwards was the CPD School Resource Officer raises the inference not only that she was aware of the school board policy, but also that she was bound by it. Insofar as Edwards' role as School Resource Officer required her to serve as a school administrator or quasi-school administrator (and the allegation that Assistant Principal Baker deferred to Edwards' advice as to whether he was needed in the interrogation of L.G. raises the inference that she played a role in school administration), she would be subject to the Board policy. The *J.M.* case establishes that a defendant need not have been employed by the school to be held liable for violation of a school policy, so long as he is told to follow the policy. Given the nature of the policy and Edwards' role at the school, a plausible inference may be drawn from the pleadings that she was aware of the policy and that she had been told to have a school official present during police questioning of students.

The Board policy states that a principal or designee "will" accompany a student being questioned by police. The policy leaves no room for the exercise of discretion. Thus, the conduct by Baker and Edwards (assuming that she is subject to the Board policy) falls "neatly into the

category of actions 'which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed.'" *Letterman v. Does*, 859 F.3d 1120, 1126-27 (8th Cir. 2017) (quoting *Southers*, 263 S.W.3d at 610). The task of ensuring that a principal or principal's designee was in the room confers no policymaking authority and requires no professional judgment. *Letterman*, 859 F.3d at 1126; *cf. Alsup*, 588 S.W.3d at 194 (finding that official immunity barred claim where defendant "had no . . . clear and unequivocal duty to use a particular restraint in a particular way"). Imposing liability on Edwards and Baker under the circumstances alleged would not have the effect of making officials in a similar position inappropriately cautious; to the contrary, it would merely encourage officials to perform their unequivocal ministerial duties. Thus, Plaintiffs have alleged facts sufficient to permit the inference that Edwards and Baker were "without discretion" to permit L.G. to be questioned in the absence of the principal or her designee.

### iii. Paul D. Coverdell Teacher Protection Act of 2001

Edwards and Baker argue that the tort claims against them are barred by the Teacher Protection Act, which provides that "no teacher in a school shall be liable for harm caused by an act or omission of the teacher on behalf of the school if -

> (1) The teacher was acting within the scope of the teacher's employment or responsibilities to a school or governmental entity;
>
> (2) The actions of the teacher were carried out in conformity with Federal, State and local laws (including rules and regulations) in furtherance of efforts to control, discipline, expel, or suspend a student or maintain order or control in the classroom or school;
>
> (3) If appropriate or required, the teacher was properly licensed, certified, or authorized by the appropriate authorities for the activities or practice involved in the state in which the harm occurred, where the activities were or practice was undertaken within the teacher's responsibility;

(4) The harm was not caused by willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual armed by the teacher; and

(5) The harm was not caused by the teacher operating a motor vehicle, vessel, aircraft, or other vehicle for which the state requires the operator or owner of the vessel, craft or vessel to -

> (A) possess an operator's license; or

> (B) maintain insurance."

§ 7946(a).[3]   The Teacher Protection Act constitutes an affirmative defense, and defendants therefore bear the burden of establishing that it applies.  *See Zell v. Ricci*, No. 18-1372, 2020 WL 1910841, at *13 n.19 (1st Cir. Apr. 20, 2020) (noting that the "affirmative defense" of the Teacher Protection Act remained to be adjudicated by the state court); *M.C.-B. ex rel. T.B. v. Hazelwood Sch. Dist.*, 417 S.W.3d 261, 265 (Mo. Ct. App. 2013) (finding that defendants failed to meet their burden on their affirmative defense under the Coverdell Act).

L.G. has asserted constitutional claims against Edwards and has alleged that Baker "permitted . . . Edwards and John Doe I and II to seize L.G. at school . . . without a warrant, probable cause or exigent circumstances," "outside the presence of a parent or adult guardian," without making any "effort to notify L.G.'s parents that she was being interrogated by law enforcement," in violation of a Board-enacted policy.  Doc. 20, ¶¶ 64-66.  Because L.G. has plausibly alleged that the actions of both Defendants are not in compliance with federal civil rights law and local rules, the Court cannot say as a matter of law at this stage that the alleged conduct of these defendants was "in conformity with Federal, state and local . . . laws . . . ."  *See Dydell v. Taylor*, 332 S.W.3d 848, 857 (Mo. 2011) (considering, but not deciding, whether local school

---

[3] L.G. does not dispute that Baker and Edwards each are "teachers" within the meaning of the Teacher Protection Act.  Doc. 37, p. 19; *see* 20 U.S.C. § 7943(6) (defining "teacher" as including "principal" and "administrator" as well as "a professional or nonprofessional employee who - (i) works in a school; and . . . maintains discipline or ensures safety . . . .")

board policy falls within meaning of the term "local law" because plaintiff failed to show breach of the policy).[4]

Edwards suggest that the Teacher Protection Act bars all negligence claims, even where they are connected with conduct that allegedly violates a statute. Doc. 48, p. 2 (citing *Dennis v. Bd. of Educ. of Talbot Cty.*, 21 F. Supp. 3d 497, 502 (D. Md. 2014) (noting that "the Coverdell Act is designed to target tort or statutory causes of action that may, for whatever reason, find their way into federal court"); *C.B. v. Sonora Sch. Dist.*, 691 F. Supp. 2d 1123, 1148 (E.D. Cal. 2009) (dismissing an emotional distress claim on the basis of the Teacher Protection Act despite Plaintiff's allegation that defendant had violated federal and state law)). Despite the decisions in *Dennis* and *C.B.*, the Court concludes that the plain language of the Teacher Protection Act— which protects educators from liability only insofar as each of the five subparts apply—precludes such an argument. If the Teacher Protection Act precluded tort claims even where they arise from a federal civil rights violation, the subpart of the statute requiring that "[t]he actions of the teacher were carried out in conformity with Federal, State and local laws (including rules and regulations)" would have no meaning or purpose. Because L.G.'s negligence claims are tied to alleged federal constitutional violations, the Teacher Protection Act does not warrant dismissal of L.G.'s state law claims at this stage.[5]

---

[4] The Court is not persuaded by Edwards' argument that a "constitutional theor[y] of recovery" is different from a violation of federal law, and in any event, L.G. brings suit pursuant to federal statutory law, 42 U.S.C. § 1983.

[5] Because the Teacher Protection Act does not require dismissal of L.G.'s state law claims, the Court need not address the alternate basis for finding the Teacher Protection Act inapplicable— the argument that L.G. failed to allege facts suggesting gross negligence or conscious, flagrant indifference to her rights.

#### iv. Public Duty Doctrine

Under the public duty doctrine, "a public employee is not civilly liable for the breach of a duty owed to the general public, rather than a particular individual." *Southers*, 263 S.W.3d at 611. The public duty doctrine does not insulate a public employee from liability "for breach of ministerial duties in which an injured party had a 'special, direct, and distinctive interest.'" *Id.*, 611-12 (citation omitted). "[W]hen injury to a particular, identifiable individual is reasonably foreseeable as a result of a public employee's breach of duty," the public duty doctrine does not apply. *Id.* at 612.

The duties at issue here—to ensure that L.G. was accompanied by a school official during police officers' interrogation and to ensure that L.G.'s parents were notified of the interrogation— were duties in which L.G. had a "special, direct, and distinctive interest." Moreover, as discussed above, the duties were ministerial. Therefore, the public duty doctrine does not immunize Baker from L.G.'s claims.

#### v. Whether L.G. Has Stated a Claim Against Baker for Negligent Infliction of Emotional Distress

Baker argues that L.G. fails to state a claim against him for negligent infliction of emotional distress. To state a claim for negligent infliction of emotional distress under Missouri law, L.G. first "must plead the general elements of negligence—that is, 'a legal duty of the defendant to protect the plaintiff from injury,' a breach of that duty, proximate cause, and injury . . . ." *Couzens v. Donohue*, 854 F.3d 508, 518 (8th Cir. 2017) (quoting *Thornburg v. Fed. Express Corp.*, 62 S.W.3d 421, 427 (Mo. Ct. App. 2001)). In addition, she must plead "'that the defendant should have realized that his conduct involved an unreasonable risk of causing distress' and 'that the emotional distress or mental injury must be medically diagnosable and must be of sufficient

Case 2:19-cv-04191-NKL   Document 55   Filed 05/12/20   Page 21 of 25

severity as to be medically significant.'" *Couzens*, 854 F.3d at 518 (quoting *Thornburg*, 62 S.W.3d at 427).

L.G. has alleged that Baker is an assistant principal at RBHS and that the Board imposed a duty on him to remain with L.G. or ensure that a different designee of the principal was with her, when she was interrogated by the police. Doc. 20 ¶¶ 3-4, 19-23. L.G. has alleged that Baker knew or should have realized that his failure to accompany L.G. or to ensure that L.G. was accompanied by a principal's designee carried an unreasonable risk of causing her distress. *Id.* at 76. L.G. has alleged that Baker's breach of the duty directly and proximately caused her damage, including by interfering with her performance on her accounting project and her anatomy final and causing her to suffer extreme anxiety. Doc 20 ¶¶ 42-43. L.G. has alleged that her emotional distress is medically diagnosable and of sufficient severity to require medical treatment in the form of both medication and therapy. *Id.* ¶ 77. Having alleged legal duty, breach thereof, facts suggesting that Baker should have realized that his conduct involved an unreasonable risk of causing distress, and that L.G.'s distress is medically diagnosable and warrants treatment, L.G. has stated a claim for negligent infliction of emotional distress.

### E. Standing to Seek Injunctive Relief

On reply, for the first time, the City of Columbia and Edwards argue that L.G. lacks standing to seek injunctive relief because she has not alleged facts suggesting that future harm is "certainly impending."[6]

---

[6] The Court ordinarily will not consider arguments raised for the first time on reply. However, "[b]ecause standing is an element of federal subject matter jurisdiction, it may be raised as an issue at any time." *Sioux Falls Cable Television v. State of South Dakota*, 838 F.2d 249, 251 (8th Cir. 1988) (citations omitted).

To have standing, a party must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, ___ U.S. ___, 136 S. Ct. 1540, 1547 (2016). "[T]he injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of L.A. v. Lyons*, 461 U.S. 95, 101-02 (1983).

L.G. seeks injunctive relief against the City of Columbia, Keisha Edwards and John Does I and II, as well as injunctive relief against Columbia Public Schools and Tim Baker.[7] She seeks injunctive relief to prevent the defendants from subjecting not only her, but also any other minor student, to custodial interrogation in the absence of certain procedural protections.

As a preliminary matter, the Court has found no legal basis for L.G. obtaining relief on behalf of all minor students in the Columbia Public School District. *See Zimmerman v. Bd. of Trustees of Ball State Univ.*, 940 F. Supp. 2d 875, 897 n.19 (S.D. Ind. 2013) ("The scope of injunctive relief the Students seek with regard to prohibiting Ball State from regulating the off-campus conduct of all Ball State students . . . far exceeds any remedy they, as individuals, would be entitled to. This is not a class action, and the Students have presented no authority suggesting that they are somehow entitled to seek relief on behalf of all Ball State students.").

As for L.G.'s right to seek such relief for herself, the Supreme Court's decision in *Lyons* indicates that she lacks standing. The plaintiff in *Lyons* was choked by police in the midst of a traffic stop. *Lyons*, 461 U.S. 95 at 105. He sought not only damages, but also an injunction barring the city's use of control holds. *Id.* at 98. The Supreme Court found that Lyons' past encounter with the police did "nothing to establish a real and immediate threat that he would again be stopped

---

[7] Baker and CPS did not raise the issue of standing, but the Court may consider the question of standing *sua sponte*. *See Frost v. Sioux City, Iowa*, 920 F.3d 1158, 1162–63 (8th Cir. 2019) (affirming *sua sponte* ruling that plaintiff lacked standing).

for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." *Id.* at 105. L.G. argues that because the chokehold in *Lyons* was inflicted seven years before the Supreme Court heard the case, and L.G.'s allegations concern more recent events, and because L.G. has alleged a pattern and practice of constitutional violations, *Lyons* does not apply to this case. However, in *Lyons*, the plaintiff alleged "routine[]" application of unconstitutional chokeholds—suggesting an ongoing custom and practice. *Id.* Nonetheless, the Supreme Court found that such an allegation "falls far short of the allegations that would be necessary to establish a case or controversy between these parties." *Id.*

L.G. does not allege a threat of any of the defendants' violating her rights in the future. Under *Lyons*, the fact that L.G. was subjected to an allegedly unconstitutional seizure of her person (even combined with the inference that such a seizure of students was commonplace) is not sufficient to suggest a threat of a similar violation of her constitutional rights in the future. *See Coleman v. Watt*, 40 F.3d 255, 259 (8th Cir. 1994) ("A speculative or hypothetical claim of future injury is insufficient to generate standing."). As such, on the face of the complaint, L.G. lacks standing to seek injunctive relief. *See id.* (finding that plaintiff had failed to satisfy requirement of "real or immediate threat" and therefore lacked standing where he had not alleged or presented evidence of "a likelihood that he will be subjected in the future to the impoundment policy"); *Pritt v. Washington County, Arkansas*, No. 5:16-CV-05329, 2017 WL 81490, at *4 (W.D.Ark., January 09, 2017) (finding that plaintiff who alleged a past unconstitutional arrest had failed to allege a "real and immediate" threat of unconstitutional arrest and therefore lacked standing to seek injunctive relief). L.G.'s requests for injunctive relief thus cannot survive.

## IV. Conclusion

For the foregoing reasons, Defendants' motions (Docs. 23 and 27) to dismiss the amended complaint are GRANTED in part, in that L.G.'s claim against Edwards in her official capacity and her requests for injunctive relief are DISMISSED.  The motions to dismiss otherwise are DENIED.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  May 12, 2020
Jefferson City, Missouri